IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:12cv636

| | |
|---|---|
| TAIDOC TECHNOLOGY CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | ORDER |
| Vs. ) | |
| ) | |
| DIAGNOSTIC DEVICES, INC., OK ) | |
| BIOTECH CO., LTD., PRODIGY ) | |
| DIABETES CARE, LLC, and JOHN ) | |
| DOES 1-10, ) | |
| ) | |
| Defendant. ) | |

**THIS MATTER** is before the court on defendants Diagnostic Devices, Inc. ("DDI") and Prodigy Diabetes Care, LLC's ("PDC") (together "defendants") Motion for Summary Judgment.[1] The motion ripened for decision on February 20, 2013 after oral arguments were held. Having carefully considered the motion, the briefs, and the oral arguments, the court enters the following findings, conclusions, and Order.

**FINDINGS AND CONCLUSIONS**

**I.     BACKGROUND**

Plaintiff Taidoc Technology Corporation ("Taidoc") brought suit in May of 2012 alleging two claims of patent infringement based on Patent No. 7,514,040 (the "'040 patent") and Patent No. 7,316,766 (the "766 patent"). Originally filed in the Eastern District of Pennyslvania, the case was subsequently transferred to the Western District of North Carolina on September 25, before finally being re-assigned to this particular court on December 20, 2012.

---

[1] Defendant OK Biotech does not join in this motion.

This, however, only constitutes the most recent chapter of litigation between these particular parties. The history between these litigants dates back to a suit originally filed in 2008, Diagnostic Devices, Inc., v. Pharma Supply, Inc., et al., 3:08CV149 (W.D.N.C. dismissed 2012) (hereinafter "the first action"), that revolved around their soured business relationship.[2] Essentially, the allegations in that case were as follows. Plaintiff DDI had entered into a formal sales agreement with Taidoc that made DDI the exclusive purchaser of "Prodigy" brand blood glucose testing products (the "the Prodigy Agreement"). Am. Verified Compl., 3:08CV559, ECF No. 14 ¶ 16, Feb. 3, 2009 (W.D.N.C. filed 2008). DDI further alleged that this agreement prohibited Taidoc from selling any other blood glucose testing products for distribution in the United States, regardless of brand, without offering DDI the right of first refusal. Id.

At the same time, DDI had also entered into an agreement with defendant Pharma Supply, Inc. ("Pharma") whereby Pharma became a distributor of Prodigy brand meters in the United States. Compl. ¶ 18, 3:08CV149, ECF No. 1-1, March 5, 2008. Eventually, the agreement with Pharma was terminated and by September 2006, Pharma had entered into a contract with Taidoc to distribute blood glucose meters in the United States under the "Advocate" brand name, thereby becoming one of DDI's competitors. Id. at ¶ 22. DDI alleged that the Advocate and Prodigy meters were identical, and the Advocate meters relied on confidential technical information shared between DDI and Taidoc. Id. at ¶¶ 16, 24. DDI filed suit against Pharma in Mecklenburg County Superior Court alleging: (1) tortious interference with the Taidoc Agreement; (2) tortious interference with DDI's prospective customers; (3)

---

[2] The case was originally filed as two separate actions, one against Pharma Supply, Inc. and one against Taidoc. In a June 2010 Order by Chief Judge Conrad, to whom the case was originally assigned, the court consolidated Diagnostic Devices Inc. v. Taidoc Technology Corp., 3:08CV559 (W.D.N.C. 2008) with Diagnostic Devices, Inc., v. Pharma Supply, Inc., et al., No. 3:08CV149 (W.D.N.C. 2008). Order, 3:08CV149 ECF No. 99, 3:08CV559 ECF No. 110.

unfair competition under state law; (4) defamation; and (5) slander. Compl., ECF No. 1-1, 3:08CV14, April 4, 2008.

Meanwhile, the relationship between DDI and Taidoc began to crumble quickly. Soon after DDI filed suit against Pharma, DDI and Taidoc ceased performance of their agreement. DDI contended that Taidoc unilaterally breached the agreement while Taidoc contended that it ceased performance because DDI had breached the agreement by selling Prodigy brand glucose meters produced by other manufacturers and failing to pay for inventory.

On September 18, 2008, Taidoc sent a letter to the FDA urging it to investigate DDI for "sell[ing] fake test strips to its customers." Diagnostic Devices Inc. v. Taidoc Technology Corp., 3:08CV559 (W.D.N.C. 2008), Amended Verified Complaint, ECF No. 14 at ¶66, February 3, 2009. Taidoc also repeated this statement in a letter it circulated to DDI's customers in January 2009. Id. at ¶ 67. DDI then filed a separate complaint and motion for preliminary injunction against Taidoc alleging: (1) libel; (2) breach of contract; (3) tortious interference with DDI's prospective customers; and (4) unfair competition under federal and state law, alleging infringement of various registered and unregistered trademarks, including the "Duo" portion of its "Prodigy Duo" trademark. Def.'s Mot. Enforce Settlement, ECF No. 249-2 at 11.

Taidoc answered and alleged a variety of counterclaims against DDI and counter-claim defendant PDC, who had begun distributing Prodigy meter and test strips in October 2009. Mem. Supp. Def. Mot. Summ. J. 4, 3:08CV559, ECF. No. 179, February 15, 2012. The counter claims against DDI and PDC were for (1) for breach of the Prodigy agreement; (2) unfair competition in violation of federal law (3) false advertising; (4) misappropriate of trade secrets; (5) unjust enrichment; (6) fraud; (7) libel per se; (8) unfair and deceptive trade practices in violation of state law; and (9) fraudulent conveyance. Additionally, Taidoc sought two

3

declaratory judgments: (1) that the Prodigy Agreement terminated as a result of DDI's distribution of competing products; and (2) that certain of DDI's alleged trademarks were merely descriptive or, in the alternative, that certain of Taidoc's trademarks did not create a likelihood of confusion with DDI's trademarks.  Def.'s Second Am. Countercl., 3:08cv149, ECF No. 142, September 2, 2011.

Eventually, in March of 2012, a trial was held and a verdict returned awarding essentially equal damages to both sides.  Jury Verdict, ECF No. 247, March 23, 2013.  On Sunday, March 25, before the court entered judgment, the parties notified the court by email that the "parties orally settled the action and anticipated filing a Rule 41 stipulated motion to dismiss" the following Monday.  Mot. Enforce Oral Settlement Agreement ¶ 2, ECF No. 249, March 28, 2012 (internal quotation marks omitted).  Subsequently, a dispute arose over the scope of the settlement agreement in that DDI insisted on reserving claims against the parties' respective attorneys and experts related to the Protective Order while Taidoc would accept nothing less than a general release.  Id. at ¶ 3.  A rash of emails were exchanged in which the parties debated whether claims for violations of the protective order were released under the settlement, with DDI's attorneys arguing for the addition of the following language explicitly reserving such claims: "Notwithstanding the foregoing, the Parties do not release, remise, quitclaim, or discharge the attorneys and experts of the other party from any claims that arise from or relate to the Protective Order in the Action."  Attach. Mot. Enforce Oral Settlement Agreement at11, ECF No. 249-2.

Taidoc refused the addition and made its expectations with regard to any settlement abundantly clear the following Wednesday by filing a Motion to Enforce Oral Settlement Agreement and Shorten Time, in which it moved the court to "enforce an oral settlement

4

agreement . . . and to compel Plaintiff Diagnostic Devices, Inc. ("DDI") to execute and deliver a *general release* without reserving claims against Taidoc's attorneys or experts for protective order violations *or other issues relating to the subject matter of this litigation*." Id. at 1 (emphasis added). In the same motion, Taidoc explained that "[t]he reservation of claims is inconsistent with the oral agreement to a 'walk away' settlement, which clearly implies a *comprehensive conclusion* to the litigation, including peripheral issues. Taidoc is unwilling to consummate a settlement agreement that does not in fact settle the controversy in its entirety." Id. at ¶ 4. Filed that same day was a Motion to Enter Judgment by DDI. 3:08CV149, ECF No. 256, March 28, 2012. Before the court ruled on the motions or entered judgment, the parties finalized the settlement agreement and filed with the court a Stipulation of Dismissal, following which the court entered an Order dismissing the action with prejudice. 3:08CV149, ECF No.'s 261, 262, March 30, 2012.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

5

Once this initial burden is met, the burden shifts to the nonmoving party. That party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Instead, that party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### III. DISCUSSION

Defendants now move for summary judgment on plaintiff's patent infringement claims on the sole basis that these claims are within the scope of the "Mutual Releases" portion of the settlement agreement. It is undisputed that patent infringement was not part of the first lawsuit; nevertheless the Prodigy brand meters there in question were the same as the accused meters in the present patent infringement suit. See Compl. ¶¶ 10, 15, ECF No. 1, May 5, 2012 (Alleging past and continuous infringement by "making, importing, offering for sale, using and selling blood glucose meters, such as "the Prodigy brand meters which embody the '040 and '766

patents). The settlement agreement agreed to by the parties in the first suit includes the following paragraph governing Mutual Releases:

> 4. **Mutual Releases**. Each Party, defined in this Agreement as including that Party's predecessors, successors, directors, officers, managers, members, and their respective heirs, executor and designees, hereby releases, remises, quitclaims, and forever discharges the other Parties (including that party's predecessors, successors, directors, officers, managers and members), and their respective heirs, executors and designees, from any and all claims whatsoever brought in, or that could have been brought in, the Action, or that in any way relate to the claims brought in, or that could have been brought in, the Action, whether in law or in equity, whether known or unknown, except solely for claims to enforcement of these terms of this Agreement.

Def.'s Mem. Supp. Mot. S.J. 2, 3:12CV636, ECF No. 29-1, December 6, 2012; Pl.'s Mem. Opp'n S.J. 4, ECF No. 35, January 9, 2013. A settlement agreement such as this is contractual in nature and state contract law is applied in its interpretation. Augustine Medical, Inc. v. Progressive Dynamics, Inc., 194 F.3d 1367, 1369 (1999). Under North Carolina contract law, "[w]hen the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court[,] and the court cannot look beyond the terms of the contract to determine the intentions of the parties." Piedmont Bank and Trust Co. v. Stevenson, 339 S.E.2d 49, 52 (1986). And the "scope and extent of the release should be governed by the intention of the parties, which must be determined by reference to the language, subject matter and purpose of the release." Chemimetals Processing, Inc. v. Schrimsher, 535 S.E.2d 594, 596 (2000). Because patent infringement is a continuing tort, see Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1221-22 (Fed. Cir. 1995), and the complaint here alleges infringement both prior and subsequent to the agreement, the court will consider them each in turn.

### A. PRE-SETTLEMENT INFRINGEMENT

With respect to the alleged infringement of the '040 and '766 patents prior to the settlement agreement through the production of Prodigy brand meters, the court finds that these

7

claims fall squarely within the claims contemplated by the "Mutual Releases" portion of the settlement agreement.³ As indicated above, the parties agreed, in relevant part, to:

> [F]orever discharge[] the other Parties from any and all claims whatsoever brought in, or that could have been brought in, the Action, or that in any way relate to the claims brought in, or that could have been brought in, the Action, whether in law or in equity, whether known or unknown, except solely for claims to enforcement of these terms of this Agreement.

Def.'s Mem, ECF No. 29-1. While clearly the patent infringement claims were not brought in the first action, a review of the record from the first case, the pleadings from the present one, as well as an extensive review of relevant case law reveals that these patents claims fall squarely within the latter portion of the above language. More specifically, they "relate to" the claims brought in the first action, or at the very least, are among claims that that "in any way relate to the claims . . . that could have been brought in" in the first action and were, therefore, released by Taidoc in the settlement agreement.

To begin, the specific products alleged to infringe the two patents in this case, the Prodigy AutoCode and the Prodigy Voice Blood Glucose Monitoring Systems, are among the blood glucose monitoring systems at issue in the first action. See Am. Compl. ¶ 19, 3:08CV559, ECF No. 14; Def.'s Second Am. Ans. Countercl. 8 ¶ 7, 3:08CV149, ECF No. 142. The nature of the allegations in the first action provides further support for this conclusion in that Taidoc's counterclaims were based on the contention that DDI was liable to Taidoc for manufacturing certain glucose monitoring systems. For example, Taidoc's first counterclaim for breach of contract includes the following allegation: "DDI breached its duty by preventing and frustrating Taidoc from receiving the benefits of the Agreement by, among other things: . . . (2)

---

³ The Complaint alleges that defendants are infringing the two patents by "making, importing, offering for sale, using and selling blood glucose meters embodying the patented invention, <u>such as</u> the Prodigy AutoCode Blood Glucose Monitorining System and the Prodigy Voice Blood Glucose Monitoring System." Compl., ECF No. 1, ¶¶ 10, 15 (emphasis added).

*Manufacturing and/or selling competing products*." Def.'s Second Am. Ans. Countercl. 28 ¶ 63 (emphasis added).

The factual allegations contained in the second counterclaim also overlap with the allegations alleged in the present complaint. There, the second counterclaim was for a declaratory judgment of non-infringement relating to DDI's claimed trademark interest in a number of marks including the marks "Prodigy Autocode" and "Prodigy Voice." Id. at ¶¶ 68-73. There, as here, Taidoc alleged that DDI was manufacturing the two monitoring systems at issue. And while the two claims differ in important respects in that the patent claim essentially alleges that DDI is liable for the construction of the two monitoring systems; both claims, at their core, still address the same essential question -- namely, the parties' respective rights with regard to the manufacturing of the "Autocode" and "Voice" blood glucose monitoring systems.

In opposition, Taidoc points out that the '040 and '766 patents were not alleged in the first action, and because Taidoc would have had to pled additional facts in order to bring the infringement claims, they are not "related to" claims that could have been brought in the first action. The language of the agreement, however, gives no indication that the parties intended for the release to be so limited in scope. Instead, it indicates the parties' clear, unambiguous, unmistakeable intent to release claims involving the manufacturing and distribution of the blood glucose monitoring systems there at issue. And, as discussed above, the allegations from the first action and those alleged here are exceedingly intertwined. While Taidoc may have had to raise the additional allegations that 1) it owned the two patents and 2) defendants' were infringing those patents, that is only relevant to whether the infringement claims "could" have been brought in the first action, not whether they are "related to" claims brought therein or that could have been brought therein.

A review of the relevant case law confirms the court's conclusion on this matter. In Augustine Medical, Inc. v. Progressive Dynamics, Inc., 194 F.3d 1367 (Fed. Cir. 1999), the Federal Circuit ruled that infringement claims for the manufacturing of convective warming blankets were released pursuant to a settlement to a prior dispute revolving the same blankets. As is the case here, the claims and counterclaims brought in the first action there included unfair competition, false advertising, and deceptive trade practices. Id. at 1369. While the issue before the court there was whether post-settlement infringement was released by the settlement agreement the court's reasoning is nevertheless instructive in determining whether pre-settlement infringement claims were released in the present case.

The court began by finding that the language in the settlement that released the defendant from claims that the plaintiff "may have" was necessarily "future-oriented" and therefore released the post-settlement infringement claims. Id. at 1371. In addition, the court considered language that released claims "relating to any acts, omissions or statements" made by the defendant, and ruled that such language provided for a release of claims with an "indirect" relationship to the factual allegations which had occurred pre-settlement. Id. at 1373. As stated above, the settlement in the present case similarly releases claims which "relate to" claims brought in the first action. While the Federal Circuit was referring to post-settlement infringement claims, the rationale is even more persuasive as it applies to the pre-settlement infringement claims in the present case. If claims which had not yet accrued were nevertheless released by the "relating to" language, then surely the pre-settlement claims currently before the court will have been released by the exceedingly similar language used in the present settlement agreement.

In contrast to Augustine Medical, the cases cited by Taidoc are factually and legally inapposite to the present case. Diversified Dynamics Corp. v. Wagner Spray Tech Corp., 106 F. App'x. 29 (Fed. Cir. 2004), an unreported case from the Federal Circuit referenced by Taidoc in its brief, held that a patent infringement claim for one patent was not released under a settlement agreement releasing an earlier infringement claim for another patent. Id. The court reasoned that based on the language of the settlement which released "actions . . . arising out of or in any way related to the [first patent]," "require[d] a relationship between the action and the patent itself." Id. at 32. The court went on to distinguish that case from Augustine by clarifying that "[r]ather than releasing all claims based on any acts or omissions before a given date, as in *Augustine*, the language of the release here is narrowly tailored to actions arising out of or related to one particular patent." Id. at 33. In the present case, the settlement agreement is not so limited; its terms are significantly broader and not limited to actions "relating to" one particular patent. By its terms, the settlement agreement releases not only actions related to the several claims brought in the first case but actions that are related to claims which could have been brought in the first action.

The remaining cases cited by plaintiff are less relevant and not in need of individual discussion. Some stand for the unremarkable proposition that factually unrelated claims are not released by narrow settlement agreements while others hold that true general releases typically provide for a complete discharge of liability between the parties. See, e.g., Weaver v. Saint Joseph of the Pines, Inc., 187 N.C. App. 198, 652 S.E.2d 701 (2007); McGladrey , Hendickson & Pullen v. Syntek Fin. Corp., 92 N.C. App. 708, 375 S.E.2d 689 (1989). Whether the release qualifies as a general release under North Carolina law is of secondary importance to whether,

based on the clear language of the agreement, the parties intended that infringement claims for the manufacturing of the two monitory systems be released.

While the agreement may not provide for a general release, after considering the pleadings from the first action; the nature of the allegations raised therein; and the language of the settlement agreement, it is unmistakable that the parties' intent in signing the release was to bring an end to a wide range of claims relating to the production and distribution of blood glucose meters. As the claims brought in the present action center on this very subject, the court finds there is no issue of material fact of whether the pre-settlement infringement claims were released by the settlement agreement, and will grant defendant's motion accordingly.

### B. POST-SETTLEMENT INFRINGEMENT

As to the alleged infringement occurring after the settlement agreement, the court finds there is a triable issue of material fact as to whether these claims were intended to be released under the language of the settlement agreement. As noted above, the Federal Circuit in Augustine ruled that post-settlement infringement claims had been released after finding that language in the agreement was necessarily "future-oriented." Augustine, 194 F.3d at 1371. Specifically, the court held that the phrase "may have" contemplated claims which arose after the settlement agreement. Id.; see also Press Mach. Corp v. Smith R.P.M. Corp, 727 F.2d 781 (8th Cir. 1984) (holding that patent claims arising after settlement agreement were released by future-oriented "might have).

In the present case, the settlement agreement contains neither the phrase "might have" nor "may have," and so the court cannot say there is no genuine issue of material fact as to whether the clear language of the agreement indicates an intent to release future patent claims. The issue, however, is exceedingly close. While the settlement agreement in this case contains

12

no such future-oriented language, it does release claims that were "related to" claims that "could have been brought" in the first action. This particular clause is especially noteworthy as the Augustine court discussed similar language contained in that settlement agreement and reasoned that the phrase "or relating to," "allowed for a general and indirect relationship between the future claims and the matters involved in the prior settlement agreement." Id. at 1373.

While, in the present case, this court is not prepared to hold that such language is sufficient to grant summary judgment for defendants, it very well may be that on appeal, the Federal Circuit would so rule. At this point, however, after considering the evidence in the light most favorable to plaintiffs, the court finds there to be a triable issue of whether the post-settlement infringement claims were released under the settlement agreement. Lastly, while the court did not here consider Taidoc's repeated representations that the release was intended to be 1) a general release; 2) a "walk-away" agreement; and 3) an end to all "hooks" between the parties, court will reserve judgment on whether the finder of fact will be free to consider this very relevant parole evidence at trial.

**ORDER**

**IT IS, THEREFORE ORDERED** that defendants' Motion for Summary Judgment (#29) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. As to Tiadoc's claims for infringement which allegedly occurred before the settlement agreement, defendants' motion is **GRANTED**.

2. As to Taidoc's claims for infringement which allegedly occurred after the signing of the settlement agreement, defendants' motion is **DENIED.**

The case shall be referred to Magistrate Judge Cayer for case management and the entry of an appropriate pretrial order.

13

Signed: April 17, 2013

Max O. Cogburn Jr.
United States District Judge